UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

UNITED STATES OF AMERICA,

                    -against-

MICHAEL COHN,

                       Defendant.

-------------------------------------------------------------------X

**MEMORANDUM
AND ORDER**

**19-CR-097 (GRB)**

**GARY R. BROWN, United States District Judge:**

      We are living in an effectively unprecedented time.  At this writing, the world continues to experience the effects of COVID-19, which has caused a historic pandemic of a kind not seen in more than century.[1]  Unless and until medical research yields a successful vaccine or effective treatment, practical tools, like wearing masks, maintaining personal distance and limiting the size, frequency and length of public gatherings, remain the only viable means to control the spread of this terrible disease.  As a result, at this writing, despite significant effort, research and investment by the Court, this district has not held a jury trial since March of this year, and in-person proceedings have been limited, although the Court has been gradually expanding its operations.

      This backdrop provides the context for a dispute in the instant criminal prosecution, in which securities fraud-related charges have been pending against the defendant for more than a

---

[1] The scope and gravity of the current public health emergency can most readily compare to the so-called Spanish Influenza pandemic of 1918, which claimed the lives of tens of millions worldwide.  To date, COVID-19 has resulted in tens of millions of cases and more than 800,000 deaths.

year.  At the Court's suggestion, the parties considered whether a bench trial could provide an appropriate avenue for resolution of the charges given the complexities posed by a potential jury trial in the current circumstances.  After careful consideration with counsel, the defendant agreed to waive his constitutional right to a trial by jury and consented to a bench trial.[2]  DE 93, 96. The Government, on the other hand, has declined to consent to a nonjury trial, insisting instead on a jury trial when that becomes a viable alternative for this case.  DE 92, 95.

Before the Court is the defendant's application to proceed with a bench trial notwithstanding the Government's objection.  DE 93.  While the Federal Rules of Criminal Procedure require the Government's consent, in extraordinary situations, the Court is empowered to conduct a bench trial upon the defendant's waiver even over the Government's objection when required by the interests of justice.  Upon careful consideration, the Court finds that the unusual, if not unique, circumstances presented by this particular case dictate that a bench trial be held notwithstanding the Government's objection.  The facts and circumstances considered within the legal framework discussed herein include (a) the length of time during which the charges have been pending, which in this case is more than a year; (b) the uncertainty of providing a jury trial in this particular case within an ascertainable time frame; (c) the complexity of this case — involving weeks of testimony and hundreds of thousands of pages of documents — which will serve to further complicate a jury trial under present circumstances; (d) the defendant's age and health profile, which not only render a trial more difficult but may bear upon his right to testify in his own defense; (e) the marked public interest in this case and the delays in its resolution, which implicates the *public's* right to a speedy trial; and (f) evidentiary issues already identified

---

[2] Prior to the commencement of a bench trial, the defendant will be required to execute a written waiver as well as to articulate a waiver in open court.

by the Court raising the specter of possible juror confusion.

Upon consideration of the facts and circumstances, as discussed below, the Court will grant the defendant's application to hold a bench trial in the absence of the Government's consent.

## BACKGROUND

**Procedural History**

This prosecution was commenced by the filing of a sealed indictment on or about February 26, 2019, charging defendant, a former employee of the Securities and Exchange Commission, with obstruction of justice and unauthorized disclosure of confidential information. The defendant was arrested on February 28, 2019 and released on a bond.  Speedy trial time was excluded until April 10, 2019 to permit the parties to engage in plea negotiations.  At an appearance before Judge Bianco on April 10, 2019, speedy trial time was again extended until June 10, 2019, and later until July, September and then October 2019, based on representations made to the Court that settlement negotiations appeared likely to resolve some or all of the charges.  Throughout this period, defendant's name was kept as a "John Doe" on the docket at the request of the parties.

On October 17, 2019, a superseding indictment was filed which added a count of "obtaining information from a Government computer" under the Computer Fraud and Abuse Act, 18 U.S.C. §1030, but remained a largely formulaic instrument.  However, a press release issued by the Government several days later provided more background on the allegations, and

made the matter public.[3]  The press release advised that defendant allegedly left the employ of the SEC to join GPB Capital Holdings, LLC, a private equity group, as its Managing Director and Chief Compliance Officer, purportedly taking with him information about an investigation into GPB improperly retrieved from a Government computer.  In that press release, Government officials advised the public that the charges "reflect the Office of Inspector General's commitment to investigate individuals who obstruct SEC enforcement activities" and "demonstrate the FBI's commitment to protect the securities industry."

On October 23, 2019, Judge Bianco entered a speedy trial exclusion to permit the filing and resolution of pretrial motions and set a trial date for March 2, 2020.  Vigorous litigation followed involving, among other things, sensitive data and hundreds of thousands of pages of discovery supplied by the Government and obtained from third parties, and the trial date was eventually continued for a time without date due to substantive issues in the case.

On February 21, 2020, Judge Bianco held oral argument on defendant's motion to dismiss Count Two of the superseding indictment, relating to the purported violation of the Computer Fraud and Abuse Act.  Defendant argued, in sum and substance, that as an employee of the SEC, his credentials permitted access to the subject computer databases.  In a bench decision, Judge Bianco explored the Second Circuit's decision in *United States v. Valle*, 807 F.3d 508 (2d Cir. 2015), cautioning the prosecution (which declined to preview its evidence in response to the motion) that, in his considered view, "a person exceeds authorized access in violation of that provision only when he obtains or alters information that he doesn't have authorization to access for any purpose, and that is the holding of *Valle*."  DE 64 at 28.  He

---

[3] "Managing Director and Chief Compliance Officer of Private Equity Firm Indicted for Obstruction of Justice," available at https://www.justice.gov/usao-edny/pr/managing-director-and-chief-compliance-officer-private-equity-firm-indicted-obstruction.

denied the Rule 12 dismissal motion made by the defendant, but cautioned that "the government better evaluate its proof" in light of the ruling, and that "waiting for a Rule 29 motion makes no sense" as "[i]t's only potentially going to confuse a jury . . ." *Id*. at 30. Judge Bianco also rejected a motion for a bill of particulars regarding the obstruction count, finding that the indictment, combined with discovery provided, appeared to give defendant adequate notice of the nature of the obstruction. *See id. at 35-38*. The parties then discussed a June trial date, though Judge Bianco advised the parties that he anticipated transferring the case to another Judge.

Speedy trial was again excluded through June 15, 2020 and the case was reassigned to the undersigned on March 2, 2020. Shortly thereafter, the COVID-19 pandemic struck, wreaking devastation across the New York area and elsewhere. While the parties and the Court endeavored to maintain the June trial date, this proved impossible. On April 28, 2020, counsel for defendant filed a joint letter on behalf of the parties asking for an adjournment of the trial from June 15 to September 8 , 2020 as a result of the pandemic. This request was made "to protect the health and safety of the parties, potential jurors, and this Court," and noted that the defendant "suffers from certain health conditions that put him at a greater risk for complications from the virus." DE 79.

On July 15, 2020, the Government again superseded the indictment, now subject to several pending motions, adding a count of theft of public property, presumably based on the same facts. The Court, with the invaluable assistance of Magistrate Judge Locke, endeavored to keep the case on track for an early September jury trial. At subsequent status conferences, counsel further articulated the need for the defendant to wear a mask throughout the proceeding due to his age and health conditions and raised concerns about the appearance of the defendant to

the jury as a result.  At a July 27, 2020 arraignment on the second superseding indictment, the

Court proposed that the parties consider a bench trial and directed counsel to file a written

response.

>By letter dated August 10, 2020, the Government stated the following:

>Upon due consideration of the relevant facts and circumstances, including the
>ongoing pandemic and the defendant's individual circumstances, and pursuant to
>Rule 23(a)(2) of the Federal Rules of Criminal Procedure, the government does
>not consent to a non-jury trial in this matter.

DE 92.  No further explanation or authority was offered.  By contrast, the defendant filed a letter

stating that

>In light of the extraordinary circumstances presented by the COVID-19 pandemic
>and Mr. Cohn's desire to have a speedy trial pursuant to his rights under the Sixth
>Amendment to the United States Constitution, Mr. Cohn has decided to waive his
>right to a jury trial and consent to a bench trial in the format offered by the Court.

DE 93 at 1.  Furthermore, in that letter, counsel for defendant urged the Court to hold a nonjury

trial notwithstanding the Government's objection and set forth authority for its position.  *Id.* at 1-

3.  Upon the Court's direction, the Government filed a responsive brief, and defendant filed a

reply thereto.  DE 95, 96.

>*The Challenges Presented by COVID-19 in the Context of a Criminal Jury Trial*

The advent of the pandemic has presented challenges to nearly every aspect of our

society.  A court attempting to protect fundamental Constitutional guarantees while continuing to

manage the crush of business arising from a crowded docket faces unique problems.  The judges

of this Court, as well as its administration and staff, have made Herculean efforts to grapple with

these issues.  The undersigned has witnessed, first-hand, the remarkable energy and resources

that have been poured into these problems and gained some understanding of the vast

complexities presented.  The Court has conferred with experts in epidemiology and HVAC

requirements, reviewed and examined scientific and government reports, monitored developing research, considered procedures adopted by and reports prepared by courts across the country, and has implemented policies and practices to help minimize risk to court personnel, attorneys, parties, witnesses and the public. [4]

Some aspects of the pandemic risks have been managed through adopting and deploying the tools used by businesses and other governmental organizations: strict adoption of face coverings and social distancing, temperature screening, individual reporting requirements, hand sanitizing, enhanced cleaning schedules, examination and management of HVAC ventilation systems, appropriate deployment of audio and video technologies,[5] etc.  These efforts, costly in terms of time, energy and money, have helped the Court administer a broad range of proceedings, and some can help facilitate a safe trial.

Jury trials, particularly in criminal cases, present singular obstacles: effective credibility evaluation (and perhaps the Confrontation Clause) requires that witnesses testify without traditional masks; and the sheer number of individuals, often from far-flung locations, involved

---

[4] For avoidance of doubt, everything contained in this document represents solely the view of the undersigned, and should not be considered the opinion of the district.  The undersigned anticipates, based on current work and information, that the district may be in a position to conduct jury proceedings in other cases quite soon, particularly in cases involving fewer participants and exhibits, shorter time frames and, most especially, a defendant without underlying health concerns.  But, again, in *this* case, under *these* circumstances, the timeframe for commencing and completing a jury trial remains quite uncertain.

[5] The Court advised the parties that the Central Islip Courthouse has high-quality, built-in video technology which would allow for multiple real-time video links between two different courtrooms.  This system may be deployed to deal with certain issues, including public access or, perhaps, testimony by high-risk individuals.  The Court may opt to provide public access through audio broadcast.  In any event, the Court will not, as suggested by the Government on this motion, be "[r]equiring the government to present all testimony in this complicated, document-intensive case through videoconferencing technology."  DE 95 at 3.

at jury selection and trial,[6] make the problem of conducting a trial with reasonable safeguards exquisitely difficult.

Trial requisites are, in some instances, contraindicated by current knowledge of the disease and the mechanisms by which it spreads, which has been developing and changing over the past months.  Experts advise that two principal mechanisms for the transmission of the disease involve large droplets (which fall to the ground relatively quickly) and smaller aerosol particulates (which may float for hours) which are emitted by infected individuals, particularly when speaking.  These risks can be substantially reduced by wearing face coverings and, to a lesser extent, plexiglass face shields.  Current thinking suggests that the number of individuals involved in a gathering and the length of the interaction serve as multipliers of infection risk, while interpersonal distance between individuals and the use of personal protective equipment can help reduce that risk.  Thus, safeguards appropriate for more common interactions — like a relatively quick retail transaction — may prove inadequate for a lengthy criminal trial.  And testimony by witnesses without masks for hours at a time — the primary activity at a trial — presents unique challenges.

One such problem is space limitations.  The Court has spent considerable time considering courtroom space utilization and allocations for social distancing during testimonial proceedings, and conferred with other judges concerning experience with other proceedings, such as grand jury selection.  When compared to many indoor spaces, courtrooms could be considered large, if not gargantuan.  But the space requirements dictated by social distancing

---

[6] Simply by way of example, and not exhaustively, depending on the case, the individuals involved in a trial proceeding could encompass the following:  jurors, alternates and potential jurors, attorneys and paralegals, parties and case agents,  witnesses, a judge, magistrate judge, law clerks and courtroom staff, deputy marshals and court security officers, maintenance and technical staff, court reporters and interpreters.

prove brutally demanding.  The Central Islip Courthouse features generously-sized facilities, including fairly large standard courtrooms and a grand ceremonial courtroom.  However, several online social distancing calculators[7] suggest that, discounting any space consumed by immovable fixtures, generalized estimates of safe occupancy range from 16 to 20 individuals for a standard courtroom and 23 to 30 individuals for the ceremonial courtroom.  Thus, accommodating a short trial involving only a single defendant, a 12-person jury with few alternates, small legal teams and a minimal court staff presents few difficulties.  However, with a longer trial like this one, involving, necessarily, more alternate jurors and larger legal teams, the situation becomes far more difficult.[8]

Creating even this level of safe occupancy requires rethinking of the use of space in the courtroom, with, for example, jurors seated in the gallery, and either moving the witness stand based upon HVAC airflow or having witnesses testifying from the juror box.  Additional time must be factored into proceedings to allow for longer breaks to allow surface cleaning between witnesses.  And all of these estimates necessarily involve providing legally-required public access through an alternative means, such as an overflow video courtroom or a public audio feed.

None of this is meant to suggest that, in certain cases, a jury trial cannot be held.  One can reasonably estimate, based on current work and information, that the district may be in a position to conduct jury proceedings in other cases quite soon, particularly in cases involving fewer participants and exhibits, shorter time frames and, most especially, a defendant without

---

[7] *See, e.g.,* https://covid19.colorado.gov/safer-at-home/social-distancing-calculator-for-indoor-and-outdoor-events; https://covid.trendyminds.com/capacity/.  These calculators provide estimates of a generalized nature; of course, a criminal trial in court presents more particularized demands and constraints.

[8] Adding other elements, such as an incarcerated defendant (requiring security personnel), parties and witnesses requiring interpreters and/or a prosecution involving more than one defendant, may render a jury trial untenable.

underlying health concerns.  But, again, in this case, under these circumstances, the timeframe

for commencing and completing a jury trial remains quite uncertain.

## DISCUSSION

*Defendant's Proffered Rationale for a Nonjury Trial*

On this motion, defendant seeks a nonjury trial over the Government's objection due to

the "extraordinary circumstances presented by the COVID-19 pandemic" as well as "Mr. Cohn's

desire to have a speedy trial pursuant to his rights under the Sixth Amendment to the United

States Constitution."  DE 93 at 1.  Defendant's invocation of "extraordinary circumstances

presented by the COVID-19 pandemic" raises several issues which, though not fully articulated

in the limited briefing of this application, are fair grounds for consideration.  In this regard, the

procedural context of this motion is important: it was not the defendant, but the Court, that raised

the question of a nonjury trial with the parties.  Thus, this is not a case in which the defendant is

attempting to invoke a "right to select his own tribunal or the right to a speedy and public trial by

a fair and impartial judge," as such a right has been firmly rejected.  *United States v. Sun Myung*

*Moon*, 718 F.2d 1210, 1217 (2d Cir. 1983).  Here, the Court introduced the possibility of a

nonjury trial as one method of dealing with the severe constraints imposed by the pandemic, and

the defendant responded by agreeing, through counsel, to waive his right to a jury trial.

*The Defendant's Waiver of the Sixth Amendment Right to a Jury Trial, and the Role of*
*the Government and the Court Therein*

As the Supreme Court recently reiterated, "[t]he Sixth Amendment promises that '[i]n all

criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an

impartial jury . . .'"  *Ramos v. Louisiana*, 140 S. Ct. 1390, 1395 (2020).  "Among the guarantees

that the Amendment provides to a person charged with the commission of a criminal offense, and

to him alone, is the "right to a speedy and public trial, by an impartial jury." *Gannett Co. v. DePasquale*, 443 U.S. 368, 379 (1979).  Trial by jury has been established by the Constitution as the normal and preferable mode of disposing of issues of fact in criminal cases. . . . The Constitution recognizes an adversary system as the proper method of determining guilt."  *Singer v. United States*, 380 U.S. 24, 35 (1965).  Undoubtedly, "[a] jury trial is the most just form of adjudication in criminal prosecutions."  *United States v. Lewis,* 638 F. Supp. 573 (W.D. Mich. 1986).  At the same time, "[o]ur society has long recognized that bench trials provide a fair and impartial mechanism for adjudication of criminal prosecutions." *Id.* (*citing Adams v. United States,* 317 U.S. 269, 279–80 (1942)).

In *Singer,* the Court noted that "a defendant can, as was held in [*Patton v. United States,* 281 U.S. 276 (1930)], in some instances waive his right to a trial by jury." *Singer,* 380 U.S. at 34; *see also Sun Myung Moon*, 718 F.2d at 1217 ("the right to trial by jury is a benefit granted an accused, which a defendant has the power to waive").  The question examined in *Singer* was whether "the effectiveness of this waiver can be conditioned upon the consent of the prosecuting attorney and the trial judge."  *Singer,* 380 U.S. at 34.  The requirement of consent on the part of the prosecution is embodied in Rule 23(a) of the Federal Rules of Criminal Procedure which provides that "[c]ases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the government."  *Singer*, 380 U.S. at 24.  The Second Circuit has observed that:

> the Supreme Court has stated that because of "confidence in the integrity of the federal prosecutor, Rule 23(a) does not require that the Government articulate its reasons for demanding a jury trial at the time it refuses to consent to a defendant's proffered waiver." Conclusive as that statement might appear, it does not end the matter. For the Supreme Court has also held that even though one has no right to a government benefit, such benefit may not be denied and when granted may not be conditioned or later revoked for a reason that infringes an individual's constitutional rights, especially First Amendment freedoms.

11

*Sun Myung Moon*, 718 F.2d at 1217–18; *compare with* DE 95 at 3 (containing the Government's argument that it has lodged a "dispositive objection" to a nonjury trial).

Indeed, the *Singer* decision upheld the procedure set forth in Rule 23(a), but noted that there "might be some circumstances where a defendant's reasons for wanting to be tried by a judge alone are so compelling that the Government's insistence on trial by jury would result in the denial to a defendant of an impartial trial." *Singer*, 380 U.S. at 37. These could include "situations where 'passion, prejudice * * * public feeling' or some other factor may render impossible or unlikely an impartial trial by jury." *Singer*, 380 U.S. at 37–38; *see also United States v. Caramadre*, 2012 WL 4762189 (D.R. I. 2012) ("the government's ability to withhold consent is not absolute"); *United States v. Schipani*, 44 F.R.D. 461, 463 (E.D.N.Y. 1968) ("As the Supreme Court recently indicated in the *Singer* case, however, there may be 'some circumstances' in which the government's insistence on a jury trial would be unreasonable").

To be sure, courts have rarely overruled Government objections to nonjury trials, thus there is scattered guidance as to the application of this exception. *United States. v. Panteleakis*, 422 F. Supp. 247, 248 (D.R.I. 1976) ("There is a paucity of decisional law interpreting *Singer*"). The *Singer* formula of "situations in which passion, prejudice, public feeling or some other factor *may* render impossible or unlikely an impartial trial by jury," provides a generalized framework for such determinations. And, because Rule 23(a) requires court approval of defendant's waiver even with Government consent, cases approving consensual bench trial requests also prove instructive as to situations where a bench trial may be appropriate.

Distilling the extant caselaw, it appears that in reviewing a defendant's waiver of a jury trial, courts may consider four factors: First, whether a governmental objection is made for an

improper purpose, *see, e.g. Sun Myung Moon*, 718 F.2d at 1217–18.  Second, whether the government's insistence on a jury trial unfairly interferes with the defendant's exercise of a separate constitutional right.  *See, e.g., Lewis*, 638, F. Supp. at 576-77 (ordering a bench trial over Government objection where jury trial violated defendant's religious beliefs); *cf. Simmons v. United States,* 390 U.S. 377, 394 (1968) ("we find we find it intolerable that one constitutional right should have to be surrendered in order to assert another").  Third, whether the government's insistence on a jury trial implicates the *public's* right to a speedy trial.  *See Zedner v. United States*, 547 U.S. 489, 501 (2006).  Fourth, whether case-specific factors, such as the nature of the evidence or the predominance of legal issues over factual issues, would render obtaining an impartial jury trial difficult or unworkable.  *See, e.g. United States v. Dupree*, 767 F. App'x 181, 183 (2d Cir. 2019) (consent bench trial on stipulated facts); *United States v. Sialeu,* 524 F. App'x 734, 736 (2d Cir. 2013) ("a jury might view Sialeu's psychiatric condition unfavorably"); *United States v. Wellington,* 417 F.3d 284, 286 (2d Cir. 2005) (consent bench trial on stipulated facts); *United States v. Lauck*, 905 F.2d 15 (2d Cir. 1990) (consent bench trial held in trial involving improper sexual contact charges against VA mental patient defendant who "d[id] not contest the criminality of his actions" while the court made determinations regarding application of statutory elements); *Panteleakis*, 422 F. Supp at  250 (case-specific issues would have exposed jurors to a quantum of inadmissible evidence resulting in unfair prejudice; bench trial held over Government objection); *Schipani*, 44 F.R.D. at 463 (evidence of prior incarceration and organized crime involvement weighed in favor of bench trial over Government's objection).

These factors are examined below.

*Factor 1: The Government's Motives in Objecting to a Nonjury Trial*

In response to the defendant's application to proceed with a bench trial over its objection, the government initially and properly asserted that it "is not required to 'articulate its reasons for demanding a jury trial at the time it refuses to consent to a defendant's proffered waiver.'" DE 95 at 1-2 (*quoting Singer*, 380 U.S. at 37).  The government nevertheless proceeded to articulate, at least in part, its rationale, as follows:

> The government's preference is to try felony criminal cases before a jury . . .  Indeed, there can be no claim that the government is somehow singling out the defendant by declining to consent to a nonjury trial; the government is unaware of any case in recent memory in which the government has consented to a nonjury criminal trial in this district. . . . Research has revealed only one prior case,[9] in 1968, in which the government appears to have, at one point, consented to a nonjury trial in this district, though it subsequently sought to withdraw that consent.

DE 95 at 1-2.  Presumably, the "government" referred to in this passage is the United States Attorney for this judicial district, as there are countless cases nationwide in which the government has consented to bench trials, *see, e.g., Sialeu,* 524 F. App'x at 736 (consent bench trial in S.D.N.Y.),  and no national Department of Justice policy is implicated by this procedure. The problem is that, even so limiting this pronouncement, it is simply untrue.

Defense counsel provided the results of a "quick search" yielding *thirteen* Second Circuit opinions reported on Westlaw in which the United States Attorney for this district consented to bench trials in criminal prosecutions.  *See* DE 96 at 1 (*citing United States v. Sobers*, 792 Fed. App'x 904 (2d Cir. 2020); *United States v. Dupree*, 767 . App'x 181 (2d Cir. 2019); *United States v. Stewart*, 2003 WL 21734681 (2d Cir. 2003); *United States v. Male Juvenile*, 121 F.3d 34 (2d Cir. 1997); *United States v. Cefalu*, 85 F.3d 964 (2d Cir. 1996); *United States v. Calvert*, 100 F.3d 941 (2d Cir. 1996); *United States v. Romano*, 938 F.2d 1569 (2d Cir. 1991); *United*

---

[9] The one prior case referenced, *United States v. Schipani*, 44 F.R.D. 461 (E.D.N.Y. 1968), is, notably, a case in which the Government consented to a bench trial, but later withdrew its consent regarding a retrial and the Court held a bench trial over the Government's objection.

14

*States v. Lauck*, 905 F.2d 15 (2d Cir. 1990); *United States v. Marin-Buitrago*, 734 F.2d 889 (2d

Cir. 1984); *United States v. Pagan*, 714 F.2d 225 (2d Cir. 1983); *United States v. Helgesen*, 669

F.2d 69 (2d Cir. 1982); *United States v. Fayer,* 523 F.2d 661 (2d Cir. 1975); and *United States v.*

*Freeman*, 498 F.2d 569 (2d Cir. 1974)).  Notably, two of these cases were reported *in the last*

*two years*.  Through independent research, the Court has identified two additional examples of

consent to nonjury trials by the United States Attorney for this district.  *See United States v.*

*Wellington,* 417 F.3d 284, 286 (2d Cir. 2005); *United States v. Ruiz-Estrella*, 362 F. Supp. 660,

661 (E.D.N.Y. 1973).  And there are almost certainly more.  Thus, the Government's fails in its

attempt to justify its position through a purported practice of consistently withholding consent to

nonjury trials.

      Substantively, however, this is of small moment.  The government's argument serves

only to counter a charge that its objection stems from some improper motive. The law is clear

that the Government is not required to articulate a reason for withholding its consent to a nonjury

trial.  Because this is the Government's right, no negative inference will be drawn from its

invocation.  At the same time, nothing prevented the Government from providing the Court with

further, more accurate information about its rationale, and such arguments have been considered

in rejecting motions such as this one.  *Sun Myung Moon,* 718 F.2d at 1218 ("it appears that the

public prosecutor elected, as was her right and based upon the reasons she gave, to have this case

tried in the constitutionally preferred manner").  Ultimately, though, the defendant has not

lodged an accusation of improper purpose, and this Court has no reason to question the

presumption of "confidence in the integrity of the federal prosecutor."  *Singer,* 380 U.S. at 37.

      Contrary to the Government's assertions here, though, prosecutorial motive is not the

only basis for overruling its objection, which is not, as suggested, "dispositive": the *Singer*

exception has been applied to factors other than prosecutorial misconduct.  The Court will examine those other factors.

*Factor Two: Conflicting Constitutional Rights*

Courts have considered whether a government objection to nonjury trial results in an unfair infringement on the exercise of constitutional rights irrespective of the government's motivation in lodging such an objection.  Indeed, in *Singer*, the Supreme Court anticipated situations in which "trial by jury would result in the denial to a defendant of an impartial trial" without reference to the Government's motivation in objecting to a nonjury proceeding.  380 U.S. at 37.  In *Lewis*, 638 F. Supp. at 579, the district court directed that it would conduct a nonjury trial over the Government's objection based upon a showing of a religious belief prohibiting participation in jury trials.  In reaching this conclusion, the court expressly disavowed any suggestion that "the government has withheld its consent to defendants' waiver on the basis of impermissible or unethical considerations."  *Id.*  Thus, the question arises whether conducting a jury trial here would conflict with the exercise of other rights by the defendant.

The first such consideration proffered by the defendant is his constitutional right to a speedy trial.  It is well established that a defendant's desire for a speedy trial, standing alone, cannot provide a basis for overruling a Government objection under Rule 23(a). *Singer*, 380 U.S. at 38 (rejecting defendant's demand for nonjury trial where "petitioner gave no reason for wanting to forgo jury trial other than to save time").  Of course, while defendant's stated preference for a speedy trial cannot be the exclusive reason for granting the motion, it remains a factor to be considered.

Of far greater concern is defendant's right to testify in his own defense, and the Hobson's Choice that would be presented to defendant should he opt to testify under present conditions.[10] It is axiomatic that, while a defendant maintains his right against self-incrimination, "[d]efendants have the right to a fair trial, which necessarily includes the right to testify on their own behalf." *United States v. Quattrone*, 441 F.3d 153 (2d Cir. 2006) (*citing Rock v. Arkansas*, 483 U.S. 44 (1987)). It is this Court's view that all testifying witnesses, in order to be subject to proper cross-examination, will have to remove medical face masks while testifying. Based on present knowledge, current circumstances of the pandemic combined with this defendant's health profile presents an unacceptable risk. Taken together, these factors, at this time, could effectively rob the defendant of a meaningful opportunity, if he chose to do so, to testify on his own behalf.

Thus, conditions arising from the pandemic effectively pit this defendant's right to a jury trial against his right to testify at that trial. Such conflict presents a problem of constitutional dimension. *Simmons v. United States,* 390 U.S. 377, 394 (1968) ("we find it intolerable that one constitutional right should have to be surrendered in order to assert another"). A nonjury trial permits far more flexibility to accommodate these concerns. By way of example, the Court's video system could be employed to permit the defendant to testify remotely, if he so chose, without concerns of jury prejudice that could arise from such a procedure.

This factor weighs heavily in favor of conducting a nonjury trial over the Government's objection.

---

[10] Given the potentially deadly consequences of COVID-19 to an individual with underlying health conditions, "Hobson's choice" appears to be the correct designation here. *S.E.C. v. Arias*, No. CV 12-2937 (ADS) (GRB), 2012 WL 4849151, at *4 (E.D.N.Y. Sept. 14, 2012), *adopted by*, 2012 WL 4849346 (E.D.N.Y. Oct. 11, 2012) (discussing distinction between Hobson's Choice and a Morton's Fork).

*Factor Three: The Speedy Trial Act and the Public Interest*

From its inception, the Supreme Court made clear that the *Singer* exception to the

government consent requisite of Rule 23(a) does not apply to a defendant's demand for a speedy

trial, without more.  But in considering the applicability of *Singer* to trial delays, the Court must

consider developing jurisprudence concerning the Speedy Trial Act of 1974, 18 U.S.C. §§ 3161-

3174, through which Congress expanded upon the right of the accused under the Sixth

Amendment "to a speedy and public trial."  U.S. Const. Amend. VI.

In *Zedner v. United States*, 547 U.S. 489 (2006), the Court examined, and ultimately

vacated, the conviction of a defendant who had "signed a blanket, prospective waiver of his

rights under the [Speedy Trial] Act."  *Id.* at 492.  In reaching this conclusion, the Court held:

> The purposes of the Act . . . cut against exclusion on the grounds of mere consent or
> waiver. If the Act were designed solely to protect a defendant's right to a speedy trial, it
> would make sense to allow a defendant to waive the application of the Act. But the Act
> was designed with the public interest firmly in mind.  *See, e.g.,* § 3161(h)(8)(A) (to
> exclude delay resulting from a continuance-even one "granted . . . at the request of the
> defendant"-the district court must find "that the ends of justice served . . . outweigh the
> best interest of the public and the defendant in a speedy trial" . . .
>
> As both the 1974 House and Senate Reports illustrate, the Act was designed not just to
> benefit defendants but also to serve the public interest by, among other things, reducing
> defendants' opportunity to commit crimes while on pretrial release and preventing
> extended pretrial delay from impairing the deterrent effect of punishment.  *See* S.Rep.
> No. 93-1021, pp. 6-8S.Rep. No. 93-1021, pp. 6-8  (citing "bail problems," offenses
> committed during pretrial release, and the "seriously undermined ... deterrent value of the
> criminal process" as "the debilitating effect[s] of court delay upon our criminal justice
> system"); H.R.Rep. No. 93-1508, p. 8, U.S.Code Cong. & Admin.News 1974, pp. 7401,
> 7402 ("The purpose of this bill is to assist in reducing crime and the danger of recidivism
> by requiring speedy trials . . .").  The Senate Report accompanying the 1979 amendments
> to the Act put an even finer point on it: "[T]he Act seeks to protect and promote speedy
> trial interests that go beyond the rights of the defendant; although the Sixth Amendment
> recognizes a societal interest in prompt dispositions, it primarily safeguards the
> defendant's speedy trial right-which may or may not be in accord with society's."  S.Rep.
> No. 96-212, p. 29S.Rep. No. 96-212, p. 29; see also id., at 6; H.R.Rep. No. 96-390, p. 3
> (1979), U.S.Code Cong. & Admin.News 1979, 805, 807.  Because defendants may be
> content to remain on pretrial release, and indeed may welcome delay, it is unsurprising
> that Congress refrained from empowering defendants to make prospective waivers of the

18

Act's application. *See* S.Rep. No. 96-212S.Rep. No. 96-212, at 29 ("Because of the Act's emphasis on that societal right, a defendant ought not be permitted to waive rights that are not his or hers alone to relinquish").

*Zedner,* 547 U.S. at 500–02.  In considering the delays that would necessarily arise from conducting a jury trial in light of the circumstances of this case, current knowledge of the dangers of the pandemic and the defendant's health risks, this Court is compelled to balance the public's right to speedy trial of this matter against the Government's preference for a jury trial.

Weight accorded to the public's speedy trial rights here are heightened by the intense public interest in this case and its resolution.  One would expect that the allegations here — charges that a government official recruited by a firm under investigation by the SEC to work as its compliance officer illegally acquired and transmitted sensitive investigative information to that firm — would naturally generate significant public attention.  This interest was stoked — nearly eight months after the commencement of the prosecution — by release of information by the government showcasing this prosecution as a cornerstone effort to protect the investing public and safeguard confidential investigative data.  As a result, and not surprisingly, this case has attracted domestic and international press attention.  *See, e.g.,* Tokar, "Private-Equity Firm Compliance Chief Indicted for Sharing Materials From SEC Investigation," *Wall Street Journal*, Oct. 23, 2019.  The public interest in this case not only extends to its facts and subject matter, but also to the delays in bringing it to a conclusion, the effect of COVID-19 on those delays, and the efforts by the Court and the parties to manage these issues.  *See, e.g.*, Wester, J. "'Close to Normal'?: Jury Trials Set for Autumn in NYC Federal Courts Face Bids to Adjourn or Move to Video," *New York Law Journal*, Aug. 19, 2020 (discussing instant motion); Shepard, Smith, Edwards & Kantas LLP, "Trial of EX-GPB Capital Holdings CCO Michael Cohn is Delayed Over COVID-19 Concerns," May 20, 2020 (available at

https://www.investorlawyers.com/blog/ex-gpb-capital-holidngs-cco-trail-delayed/); Stone, Jeff, "Trial Delayed for Former SEC Watchdog Accused of Abusing Computer Access," May 1, 2020 (available at https://www.cyberscoop.com/sec-computer-hacking-trial-delayed/).  This intense press attention concerning the trial and, perhaps more unusually, delays in its resolution, are emblematic of the public interest in this case, and reinforce the importance of the public interest in a speedy trial of this matter, which has now been pending for a year and a half.

In its response, the Government asserts "that conducting a trial without a jury poses many of the same safety risks as a jury trial."  DE 95 at 3.  While true, the argument misses the mark: the increased number of individuals involved in jury selection and trial, and the invariably longer amount of time consumed in a jury trial, greatly increase both the disease transmission risk and the space and resources required.  While not insurmountable, the challenges of conducting a trial at the present time multiply when factoring in a jury proceeding.  This is particularly true of a case projected to take several weeks if tried before a jury and described by the prosecutors as a "complicated, document-intensive case."  *Id*.  In its papers, "the government acknowledges that the current COVID-19 pandemic poses unique logistical challenges that may delay jury trials, including in this case," but claims that "the defendant has not articulated any compelling individual circumstances that differentiate him from the many other defendants whose cases remain pending."  *Id.* at 2.

But, as demonstrated herein, this case has a number of distinctive characteristics — including its inherent complexity and length, and the defendant's age and health, that make a jury trial in this case more difficult than in many other matters under present circumstances. While the Court has, and will continue, to grapple with these problems, at this writing, it remains unclear when a jury trial could commence in this particular case, and even if started, whether that

20

trial would be afflicted by inordinate delay.  As such, the public interest in a speedy trial would be far better served by a nonjury trial, which could commence sooner, and be more certain of successful conclusion under present circumstances.[11]

Thus, this factor weighs in favor of overruling the Government's objection for a nonjury trial.

*Factor Four: Other Case-Specific Factors*

Litigation in this matter has already identified a potential source of inadmissible evidence to which jurors would be exposed arising from an intertwined legal issue.  In denying the defendant's motion to dismiss the computer access charge in this case, Judge Bianco ruled that, in his view, the Government may have misconstrued the holding of *Valle*, cautioned that "the government better evaluate its proof" in light of the ruling, and added that "waiting for a Rule 29 motion makes no sense" as "[i]t's only potentially going to confuse a jury . . ."  DE 64 at 29-30. Nothing on this record suggests that the government has conducted such an evaluation, or has changed its position in the prosecution.  To the contrary, the Government has added yet another legal theory: theft of public property, which is subject to pending motions.  Thus, the Court already determined that the government's case could well expose a jury to inadmissible and confusing evidence.

Defense counsel has also raised another source of potential prejudice for a jury at this time: defendant's health conditions —which the government has not contested — requires that

---

[11] For avoidance of doubt, this decision should not be construed as a holding that there has been a violation of the Speedy Trial Act.  To date, it appears that time has been properly excluded under the Act.  However, given the uncertainty of commencing a jury trial in this case, the public's right to a Speedy Trial is sufficiently implicated as one of several considerations mitigating in favor of commencing a nonjury trial over the Government's objection.

he be masked throughout the proceeding, posing some danger of jury prejudice.[12]  To be sure, this risk would be ameliorated by the fact that all trial participants — other than the testifying witness — will be wearing masks.

Standing alone, these two factors would not require a jury trial, as it seems likely that any prejudice could be resolved through corrective instructions.  Nevertheless, the potential for jury prejudice from these factors weighs in favor of a nonjury trial, and must be considered in conjunction with the remaining factors.

## CONCLUSION

Taken together, and balancing the various interests, the Court finds that the Government's interest in objecting to a jury trial is far outweighed by the factors enumerated and discussed above.  As such, that objection is overruled, and this matter will, upon completion of a written jury trial waiver after appropriate inquiry of the defendant in open court, be set for a nonjury trial before the undersigned.  The parties are directed to appear before the undersigned in person on September 8, 2020, so that these matters can be completed and all pretrial issues may be resolved.  A nonjury trial will commence shortly thereafter.

Dated:  Central Islip, New York
       August 26, 2020

                                    /s/ Gary R. Brown_____
                                  Gary R. Brown
                                  United States District Judge

---

[12] Defense counsel raised this to request a curative jury instruction.