

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AES:LHE/JAM
F. #2018R01064

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 15, 2021

By ECF

The Honorable Gary R. Brown
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

> Re:   United States v. Michael Cohn
>        Criminal Docket No. 19-97 (S-3) (GRB)

Dear Judge Brown:

　　　　The government respectfully submits this letter in advance of the sentencing hearing in the above-captioned case, which is scheduled for March 24, 2021.   For the reasons set forth in this letter, the government respectfully submits that a custodial term of six months or less would be sufficient, but not greater than necessary, to achieve the goals of 18 U.S.C. § 3553(a).

I.　　　Factual Background

　　　　Prior to his arrest in connection with the instant case, the defendant served as the Managing Director and Chief Compliance Officer of GPB Capital Holdings, LLC ("GPB") a private equity firm based in Manhattan and Garden City, New York that, at its height in 2018, purported to manage over $1.5 billion in assets.   Prior to joining GPB, in or about October 2018, the defendant worked as a Securities Compliance Examiner and Industry Specialist in the Enforcement Division of the Securities and Exchange Commission ("SEC"), where he investigated and supported enforcement actions against registered and private funds for violations of federal securities laws.

　　　　A.　　The SEC Network and Internal Databases

　　　　During his time as a member of the SEC's Enforcement Division, the defendant had access to SEC computer and communications resources, including remote access via an SEC-issued laptop.   He was provided with his own unique employee account on the SEC network.   To access a computer or terminal on the SEC network, the defendant had to input a unique username and password.   After the username and password were accepted, a "WARNING and USER CONSENT" page would be displayed, which read, inter alia, "[y]ou are accessing a U.S. government information system, which includes the computer and computer network.   This

information system is provided for U.S. Government-authorized use only . . . [u]nauthorized or improper use of this information system may result in . . . civil and criminal penalties."   The defendant was then required to certify and accept these conditions by clicking "OK," after which access to the SEC network would be granted.

Various informational databases and systems containing confidential information relating to SEC investigations were available to designated SEC employees, including the defendant, over the network, including:

- The Tips, Complaints and Referrals ("TCR") system:   a database that contains the identity of SEC whistleblowers, the substance of their complaints, and any documentation they provide in support of their allegations;
- The HUB:   a web-based application that tracks Enforcement Division matters and can include, among other information, a description about why the matter was opened, whistleblower information, a description of investigative steps taken, and plans for future investigative and related actions;
- Visual Analytics and Dashboard for Registrants ("VADR"): an internal dashboard application that provides summary data, metrics, and analytics on select SEC registrants, allowing SEC staff to more efficiently view and interpret information related to registered entities; and
- TRENDS: an electronic platform that manages the examination program of the SEC's Office of Compliance Inspections and Examinations ("OCIE"), to include tracking and reporting of examination data and housing electronic documentation for all OCIE groups.[1]

The confidential information housed within these databases includes attorney-client and attorney work product privileged materials; whistleblower and other confidential witness information; details regarding SEC examinations and enforcement actions; information obtained from other regulatory bodies and law enforcement entities; and other sensitive, non-public information.

All of these databases are password-protected.   Each contains a warning banner on their respective login pages that reads, inter alia, "this computer system is Federal property and to be only used for authorized government purposes…misuse of this computer system is a violation of Federal Law (Public Law Number 99-474 [the CFAA])."   Additionally, the defendant, like all users, was required to complete various trainings and pledge to use the SEC network and its internal databases for authorized work purposes only.   Indeed, "Rule #1" of the "Rules of the Road," which are the SEC's use policies for information technology resources, cites the Computer Fraud and Abuse Act ("CFAA"):

---

[1]      As an employee of the Enforcement Division, the defendant had access to the UB and the TCR system; he was granted access to VADR and TRENDS upon his request and, in the case of VADR, that access grant was premised upon his representation that he needed access in relation to a specific case.

Unauthorized or improper use may result in disciplinary action (up to and including removal), civil and criminal penalties, and financial liability for the cost of improper use. Misuse of SEC IT resources may constitute a federal criminal offense under the Computer Fraud and Abuse Act of 1986 (P.L. 99-474, 18 U.S.C. § 1030). Evidence of criminal activity or other misconduct will be provided to the SEC's Office of Inspector General, which may refer the matter for criminal prosecution.

The defendant, like other SEC employees, had to repeatedly sign acknowledgements and disclaimers during his tenure that he would abide by these rules as a precondition of using the SEC network and databases.

B.      GPB Background

GPB is a New York-based SEC-registered investment adviser that manages several private equity funds.   A number of those funds, including GPB Holdings, L.P., GPB Holdings II, L.P. and GPB Automotive Portfolio, L.P., were invested largely or primarily in car dealerships, though they also held investments in other industries including technology companies.   The founder and Chief Executive Officer of GPB is David Gentile.   Jeffry Schneider is the owner and CEO of Ascendant Capital LLC, which marketed GPB investments.   Jeffrey Lash is a former managing partner of GPB.   GPB Employee #1 previously served as GPB's Managing Partner.   In approximately the fall of 2017, GPB purchased Prime Automotive Group, a network of car dealerships in the northeast.

In approximately 2018, GPB was the subject of an examination by SEC OCIE, and, later in 2018, it became the subject of an investigation by the SEC's Enforcement Division.

On March 19, 2018, Patrick Dibre, a former operating partner of GPB, filed a counterclaim in a lawsuit initiated against him by GPB alleging that GPB was operating a "complicated and manipulative Ponzi scheme."   GPB v. Patrick DiBre, Nassau County Supreme Court, Index No. 606417/2017 (the "Dibre Lawsuit").   Since that time, several civil plaintiffs have filed other actions, alleging fraud and other claims, against GPB.

On January 29, 2021, a federal grand jury sitting in the Eastern District of New York returned a sealed indictment charging David Gentile, Jeffry Schneider and Jeffrey Lash with engaging in a scheme to defraud GPB investors and prospective investors through material misrepresentations and omissions.   The indictment was unsealed on February 4, 2021, when the individual defendants were arrested.   On February 4, 2021, the SEC filed a complaint, 21 CV 583 (MKB), against defendants GPB Capital Holdings, LLC; Ascendant Capital, LLC; Ascendant Alternative Strategies, LLC; David Gentile; Jeffry Schneider; and Jeffrey Lash, involving substantially the same conduct as alleged in the indictment.[2]

---

[2]      Numerous civil cases were also initiated by various state governments on or about February 4, 2021.

3

C.    The Defendant's Offense Conduct

At no point during his employment with the SEC was the defendant assigned to work on or assist with any GPB-related matter, nor did SEC attorneys or investigators request the defendant's assistance on any GPB-related matter.    Nevertheless, on several occasions in September 2018, the defendant accessed numerous SEC databases—including the HUB, TCR, VADR and TRENDS—and retrieved highly sensitive, confidential information related to the investigation of GPB by the SEC's Enforcement Division and GPB's examination conducted by OCIE.    This was done remotely with the defendant's SEC-issued laptop while the defendant was at home in Connecticut.

Based on a review of SEC records, the defendant's activity in this regard includes the following:

- Opening the GPB case file and executing multiple GPB-related searches in the HUB database, which yielded non-public information regarding the subject matter and type of conduct being investigated; access requests from other agencies; a list of personnel working on the matter; ███████████████ details of subpoenas issued and investigative steps taken and planned by SEC staff; prior SEC investigations and actions regarding GPB; and contacts between the SEC and law enforcement entities regarding the investigation.    Within the GPB case file, the defendant opened the highly-sensitive Formal Order Memorandum prepared by Enforcement Division attorneys assigned to the GPB investigation.    This document, which is stamped "privileged and confidential," contains attorney client materials, attorney work product and ███████████████

- Conducting several GPB-related searches within the TCR system.



- Searching for and viewing non-public GPB-related information in VADR and TRENDS, including information reflecting deliberations about examinations generated by the SEC; confidential information obtained from other regulatory agencies, including the Financial Industry Regulatory Authority ("FINRA"); internal risk assessments for public companies and other registrants; and the results of proprietary risk models that reveal non-public information about GPB and other similar registrant types.    The defendant also downloaded the main "dashboard" page relating to GPB from VADR in PDF form.

The first of these unauthorized searches of SEC databases happened almost immediately after the defendant's headhunter told him that GPB was a prospective employer for a Chief Compliance Officer position.    Specifically, based on the defendant's email records, the

defendant conducted his first unauthorized search in SEC databases approximately 15 minutes after this conversation with the headhunter.   The defendant's first interview with GPB occurred on October 4, 2018.

While the defendant was interviewing for a position at GPB, he intimated to individuals at GPB that he had inside information regarding the SEC's investigation of GPB. Indeed, on various occasions both prior to and following his hiring, the defendant disclosed confidential information relating to the SEC investigation to senior management at GPB.   A confidential witness ("CW-1") consensually recorded a number of conversations that he had with the defendant and others at GPB regarding the confidential information the defendant had procured from the SEC (the "Recorded Statements").     Transcripts of the Recorded Statements are attached hereto as Exhibit A.   These conversations memorialized in the Recorded Statements include:





The defendant's last day at the SEC was October 12, 2018.   He accepted a $400,000 per year position with GPB four days later.   The defendant did not disclose his potential employment with GPB during his SEC exit interview with the Office of Ethics Counsel, which was held on October 10, 2018.   Nor did he disclose the fact that he had obtained information about the SEC's investigations and examinations into GPB from the SEC network.   This exit interview advised the defendant about his responsibilities pursuant to, inter alia, 18 U.S.C. §§ 207 and 208, which prevent former government employees from taking certain actions after leaving a federal job that could involve the unfair use of influence and information gained through government employment.

II.     The Defendant's Plea

On September 8, 2020, the defendant pled guilty to a Superseding Information charging him with a misdemeanor violation of 18 U.S.C. § 641.   In his plea allocution, the defendant stated the following:

> While an SEC employee, I intentionally accessed confidential information that belonged to the SEC relating to SEC investigations into GPB.  I took that information for my own personal use.  I used that information to prepare for my job interview at GPB and I believe the information gave me an advantage in the interview process.  I took the job at GPB and became Chief Compliance Officer while in possession of this information.

The defendant pleaded guilty pursuant to a plea agreement with the government. In the plea agreement, the government provided the following Guidelines estimate:

Base Offense Level (§2B1.1)                                                        6

| | | |
|---|---|---|
| Plus: | Abuse of Trust (§3B1.3) | +2 |
| Plus: | Obstruction of Justice (§3C1.1) | <u>+2</u> |
| Total: | | 10 |

The government calculated the defendant's Criminal History Category to be Category I, resulting in a Guidelines sentencing range of 0-6 months.   In the plea agreement, the parties expressly agreed that (1) the Guidelines estimate therein was "not binding on the [government], the Probation Department or the Court," (2) if the Guidelines offense level "advocated by the [government], or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement," and (3) the defendant had the right "to dispute the government's Guidelines calculation at time of sentencing."   <u>See</u> Plea Agreement dated September 8, 2020, at ¶¶ 2-3.

III.   <u>The Presentence Report</u>

In the PSR, the United States Department of Probation for the Eastern District of New York ("Probation") set forth the following Guidelines calculation:

| | | |
|---|---|---|
| Base Offense Level (§2B1.1) | | 6 |
| Plus: | Loss in Excess of $300,000 (§2B1.1(b)(1)(G)) | +12 |
| Plus: | Abuse of Trust (§3B1.3) | +2 |
| Plus: | Obstruction of Justice (§3C1.1) | <u>+2</u> |
| Total: | | 22 |

Probation further concluded that the defendant was in Criminal History Category I.   Because the statutory maximum sentence for the crime of conviction is 12 months, this resulted in a Guidelines range of imprisonment of 12 months.

On February 26, 2021, the defendant submitted a letter to Probation containing several objections, including objections to the 12-level enhancement for loss and the 2-level enhancement for obstruction of justice ("Def. Prob. Ltr.").   The defendant contended that the loss enhancement should not apply because "the government has in fact already determined that the loss amount does not exceed $1,000 . . ., charged Mr. Cohn with the misdemeanor offense of converting property, the value of which does not exceed $1,000 and it clearly stated in the plea agreement that there should be no enhancement for loss."   Def. Prob. Ltr. at 2.   The defendant also argued that the obstruction of justice enhancement should not apply, because the defendant did not obstruct or impede the instant offense of conviction, and because the evidence does not support such an enhancement.   <u>Id.</u> at 2-3.   On March 5, 2021, the government responded to the defendant's objections, and agreed with Probation that the 12-level enhancement for loss should apply because while calculation of a loss to the SEC resulting from the defendant's offense is difficult to quantify, his offense did result in a gain in excess of $300,000, namely, his salary.   <u>See</u>

U.S.S.G. § 1B1.3 ("specific offense characteristics … shall be determined on the basis of all acts and omissions … willfully caused by the defendant [and] all harm that resulted from [those] acts and omissions"); § 2B1.1 Application Note 3(B) ("the court shall use the gain that resulted from the offense" when "there is a loss but it cannot reasonably be determined").   The government also agreed with the defense that the 2-level enhancement for obstruction of justice should not apply because the defendant's obstructive conduct did not obstruct or impede the instant offense or a closely related case as those terms are defined in Application Note 1 of U.S.S.G. § 3C1.1.   In its letter, the government concluded that the correct total offense level should be 17.

On March 12, 2021 Probation issued an Addendum to the PSR agreeing with the government's calculation of the Guidelines range and setting forth a revised total offense level of 17.

The government maintains that under applicable law, the defendant's adjusted offense level is 17, yielding an effective Guidelines range of 12 months.   However, the government acknowledges that the estimate set forth in the plea agreement was erroneous in two respects: (1) its failure to include an enhancement for loss/gain under U.S.S.G. § 2B1.1 and (2) its inclusion of an enhancement for obstruction of justice, which does not apply because the defendant's obstructive conduct did not obstruct or impede his offense of conviction or a closely related case (but rather civil and criminal investigations into GPB that were not closely related).

The government respectfully submits that the Court should sentence the defendant to a custodial term within the range set forth in the plea agreement, i.e., six months or less.

IV.     Sentencing Considerations Under 18 U.S.C. § 3553(a)

The government submits that the Court should impose a custodial sentence within the range of six months or less because such a sentence is sufficient, but not greater than necessary, to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."   18 U.S.C. § 3553(a)(2)(A).   A custodial sentence will also further the aims of specific and general deterrence.

The defendant's offense was serious.   As an employee at a government regulatory agency, the defendant had unusual access to highly confidential, sensitive information, and the defendant's conduct in obtaining that information unlawfully and then using it for his own personal gain was wrong.   Moreover, it violated the trust that the public places in government employees to live up to the legal and ethical standards imposed upon them.   Additionally, as summarized above, the defendant's conduct included disclosing sensitive details about the SEC's investigation into GPB's management to leadership at GPB.   Such information is invaluable to a company in GPB's position, essentially flipping the typical informational advantage held by a regulator; informing the company's strategy for its defense; providing the facts necessary for its management to identify evidence and witnesses relevant to the SEC's investigation; and determining how to best minimize the risks posed by that evidence and those witnesses, obfuscate facts and otherwise impede the SEC.

Not only did the defendant divulge non-public, confidential information about the GPB investigation to GPB leadership, he accepted a position as Chief Compliance Officer, a role

8

that necessarily encompasses oversight over the very investigation he unlawfully learned about when at the SEC.   By accepting that role, Cohn put himself in a position to unlawfully influence GPB's response to the SEC's investigation, as it would be impossible for him to detach himself from the confidential insider information he learned as a result of his crimes.   Moreover, by lying about his future employment prospects with GPB during his SEC exit interview, the defendant averted any inquiry about his knowledge of the SEC's investigation and hid this clear conflict of interest.   This behavior, beyond simply being unethical and unlawful, was necessarily obstructive to both the civil and criminal investigations into GPB.

While it is unlikely, given his conviction, that the defendant will find future employment at a government agency, it is nevertheless important for the sentence issued in this case to afford general deterrence to other government employees who may be tempted to use their access to confidential information improperly to secure private sector employment.   To deter such conduct, the punishment must outweigh the potential benefit.

For all of these reasons, the government respectfully submits that a custodial sentence of six months or below, consistent with the plea agreement, would be consistent with the principles of Section 3553(a), because it would punish the defendant for his wrongful conduct and afford general deterrence without being unduly punitive.

Respectfully submitted,

SETH D. DuCHARME
Acting United States Attorney

By:     /s/
Lauren Howard Elbert
Artie McConnell
Assistant U.S. Attorneys
(718) 254-7577/7150

cc:   Clerk of the Court (GRB) (by ECF)
Defense counsel (by ECF and Email)

9